UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------- X

APEX COMMERCIAL EXCHANGE, LLC, :

Plaintiff, :

-against- :

CW FINANCIAL SERVICES LLC and CWFS-REDS LLC, :

Defendants.

---------------------------------------------------------- X

## COMPLAINT

Apex Commercial Exchange, LLC ("Apex"), through its counsel, Trachtman and Poler Law LLC, for its complaint against CW Financial Services LLC ("CW"), and CWFS-REDS LLC ("REDS") (collectively, "Defendants") alleges as follows:

## PRELIMINARY STATEMENT

1. Apex operates a commercial real estate auction platform at acexchange.com (the "Platform"). Through the Platform, Apex provides buyers, sellers, and brokers access to secure, technology-driven online auctions of commercial properties, as well as services that facilitate such auctions.

2. The Platform includes specific product features and designs developed by Apex. This includes advanced AI features that allow users to evaluate listings, bidders, and market properties more effectively than they would be able to do with a more traditional platform.

3. Apex spent about a year, and more than $700,000, developing these features, which represented a significant competitive advantage for Apex because, before the events set forth below, they were not known to Apex's competitors. At the time of development, none of Apex's competitors offered similar options.

4. CW provides a range of services in the commercial real estate industry including RealInsight Marketplace, which is operated by CW's affiliate, REDS. RealInsight Marketplace (the "Marketplace") is a direct competitor to the Platform.

5. As set forth in further detail below, in direct violation of the terms of service applicable to the Platform, CW employees created a fictitious name, email account, and phone number, and used these to access the Platform and its technologies.

6. On information and belief, CW shared the information gleaned through this unauthorized access with REDS, which used that information to develop features for its competing product, the Marketplace.

## **THE PARTIES AND RELEVANT NON-PARTY**

7. Plaintiff Apex Commercial Exchange LLC is a Delaware limited liability company. It maintains an office at 77 Sands Street, 6th Floor, Brooklyn, NY 11201.

8. Defendant CW Financial Services LLC is a Delaware limited liability company. According to its website, it maintains an office at 400 Madison Avenue, Suite 6AB, New York, NY 10017.

9. Defendant CWFS-REDS LLC, which is an affiliate of CW, is a Delaware limited liability company. According to its website, it maintains an office at 400 Madison Avenue, Suite 6AB, New York, NY 10017. It is registered to do business in New York State.

10. Kevin Lipson ("Lipson") founded Apex in 2025. From July 2020 through November 2024 Lipson was a CW employee.

## **JURISDICTION AND VENUE**

11. This Court has personal jurisdiction over CW and REDS pursuant to N.Y. CPLR §§ 301 and/or 302(a)(1).

12. This Court has subject-matter jurisdiction over Apex's claim under the Defend Trade Secrets Act ("DTSA") pursuant to 18 U.S.C. § 1836 and 28 U.S.C. § 1331.

13. This Court has supplemental jurisdiction over Apex's other claims pursuant to 28 U.S.C. § 1367 because they are so related to Apex's claims under the DTSA that they form a part of the same case or controversy.

14. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Apex's claims occurred here as Apex operates the Platform from its office in Brooklyn.

## FACTUAL ALLEGATIONS

### Apex and Defendants Are Competitors

15. Both Apex and Defendants provide services to individuals and entities in the commercial real estate industry.

16. As noted above, Apex's Platform facilitates online auctions of commercial real estate. The Platform includes product features and designs developed by Apex.

17. These auctions are for commercial real estate throughout the United States and are accessible to buyers, sellers and brokers throughout the United States. As such, the Platform is used in interstate commerce.

18. For its part, CW provides a suite of services and products to individuals and entities that own and manage commercial real estate.

19. This includes the Marketplace, which is operated by CW's affiliate, REDS.

20. The Marketplace is a direct competitor to the Platform. It hosts online auctions for commercial real estate, allows brokers to list commercial properties for auction, and hosts due diligence materials in advance of such auctions.

21. However, prior to the events described below, the Marketplace did not include any of the Platform's advanced features.

**Apex's Platform**

22. As noted above, Lipson used to work for CW. Upon leaving CW, he founded Apex and created the Platform.

23. Notably, the Platform incorporates advanced AI that allows users to evaluate listings and bidders, and market properties more effectively than they would have been able to do with a more traditional platform. This includes, but is not limited to, tools that allow:

a. users to quickly generate investment summaries;

b. brokers to track the effectiveness of marketing campaigns and the channels of those marketing campaigns using a sophisticated back end;

c. brokers to directly manage listing due diligence materials, property photos, and deal narratives;

d. sellers and brokers to analyze buyer behavior and history on the platform and use this information to inform pricing;

e. brokers to measure the interest of prospective buyers; and

f. users to translate the language of the listing and summarize due diligence materials (collectively, the "Trade Secrets").

24. Apex's Trade Secrets cannot be accessed from the public pages of the Platform, or through Apex's marketing materials. It took Apex approximately one year and $700,000 to develop these Trade Secrets.

25. Apex protects its Trade Secrets by, among other things, requiring users to register to use the Platform using truthful and accurate personal information. Apex also protects its Trade Secrets by requiring its employees and contractors to execute non-disclosure agreements.

26. With respect to individuals or entities wishing to use the Platform, Apex's Terms of Use, effective October 27, 2025 (the "Terms"), a copy of which is attached hereto as Exhibit A, requires users to "provide only truthful and accurate information when registering and creating an account." (Ex. A, ¶ III.)

27. The Terms prohibit any direct or indirect competitor from accessing or using the Platform. (*Id.*, VII(b)(15).)

28. In addition, the Terms specifically prohibit users from: (a) using the Platform, directly or indirectly, to create a derivative product; (b) using the Platform to "provide services that compete, directly or indirectly, with [Apex] or its affiliates;" (c) copying, distributing, or disclosing any part of the Platform's services or products; and (d) "[i]mpersonat[ing] another person or entity, misrepresent[ing] your affiliation with any person or entity, engag[ing] in fraudulent activity, or conceal[ing] or attempt[ing] to conceal your identity." (*Id.*, VII(b)(1), (8), (9), (14).)

29. Apex requires every user to affirmatively accept the Terms before creating an account.

30. Prior to the events set forth below, the Trade Secrets provided Apex with a significant competitive advantage because they were only available on the Platform and not through competing websites, such as the Marketplace.

**CW Employees Create an Account Using Fake Information**

31. On or about April 16, 2026, someone created a user ID under the name "Marv Harry." This account was set up using the email address "marvharry1033@gmail.com," and a non-working phone number.

32. On information and belief, the user ID "Marv Harry" was a reference to the burglars in the movie *Home Alone* who are named "Marv" and "Harry." In the movie, these burglars break into Kevin's house, and the selection of this user ID and the email address "marvharry1033@gmail.com" was a taunt directed at Lipson, whose first name is Kevin.

33. On further information and belief, the "Marv Harry" account was, in fact, created by one or more CW employees.

34. This belief is based on an April 21, 2026, call between Lipson and CW employee Luke Pieroni ("Pieroni"). During this call, Pieroni admitted to creating the "Marv Harry" account because "**<u>we</u>** wanted to see the back end . . ." of the Platform.

35. Pieroni's statement is notable not only because it constitutes an admission, but also for its use of the first-person plural "we," instead of the first-person singular "I." On information and belief, Pieroni's use of the first-person plural indicates that he was acting on behalf of his employer, CW.

36. CW's involvement in the creation and use of the "Marv Harry" account is further supported by the fact that the IP address associated with the "Marv Harry" account originated in midtown Manhattan, where CW's offices are located.

37. Between April 16 and April 20, 2026, CW employees used the "Marv Harry" account to repeatedly access the Platform.

38. They used this account to access non-public diligence materials for at least five listings, including the KeyBank Building, the Hilton Garden Inn Jacksonville, and the Comfort Inn Grand Rapids. They also used the "Marv Harry" account to create a test listing. On information and belief, by doing this CW employees were able to probe the Platform's non-public seller and broker-side back-end functionality.

39. This information would have been unavailable through the "Marv Harry" account if those behind it complied with the plain language of the Terms as they require, *inter alia*, the use of truthful and accurate information to create an account, as well as bar competitors from creating an account on the Platform.

**REDS' Launches a Product Incorporating Apex's Features**

40. In June 2026 – approximately two months after "Marv Harry" accessed the Platform – Damian Smoter, who oversees the Marketplace was quoted in *Hotel Business* discussing forthcoming updates to the Marketplace including, "expanded buyer tracking capabilities and AI-driven tools."

41. On or about September 8, 2026, REDS launched an updated version of the Marketplace.

42. On information and belief, REDS' update added AI-based buyer-activity tracking, marketing-campaign source tracking, as well as greater visibility into leads and engagement, buyer profiles with bidding history, "AI insights," enhanced tracking of auction and bidder status, and allowed brokers to directly manage listing due diligence materials, property photos, and deal narratives.

43. On information and belief, the Marketplace's inclusion of these features was the result of CW and REDS misappropriation, disclosure, and use of the Trade Secrets.

44. Before REDS' update of the Marketplace, these features were available only on the Platform, but not on the Marketplace.

**AS AND FOR FIRST A CAUSE OF ACTION**
**(Violation of the Defend Trade Secrets Act)**
**(Against CW and REDS)**

45. Apex repeats and realleges each of the foregoing paragraphs as if set forth in full herein.

46. The Trade Secrets constitute trade secrets as defined by 18 U.S.C. § 1839(3) because, as set forth above, Apex has taken reasonable measures to keep the Trade Secrets secret, and the Trade Secrets were valuable to Apex because they were not generally known and, as a result, the Trade Secrets had significant competitive value to Apex.

47. The Trade Secrets were and are part of the Platform, which is used in interstate commerce.

48. CW acquired Apex's Trade Secrets through improper means. More specifically, on information and belief, CW's employees created a user account with a fake name and used this account to repeatedly access the Platform.

49. This access violated the Terms, which bar users from (a) using the Platform, directly or indirectly, to create a derivative product; (b) using the Platform to "provide services that compete, directly or indirectly, with [Apex] or its affiliates;" (c) copying, distributing, or disclosing any part of the Platform's services or products; and (e) "[i]mpersonat[ing] another person or entity, misrepresent[ing] your affiliation with any person or entity, engag[ing] in fraudulent activity, or conceal[ing] or attempt[ing] to conceal your identity." (Ex. A, VII(b)(1), (8), (9), (14).)

50. On information and belief, CW disclosed the Trade Secrets to REDS without Apex's authorization. This is evidenced by REDS' creation of an updated version of the Marketplace incorporating many of the Trade Secrets. On further information and belief, REDS knew that the Trade Secrets were acquired by improper means as CW leadership oversees both REDS and the Marketplace.

51. As a direct and proximate result of Defendants' misappropriation, disclosure and use of the Trade Secrets, Apex has been damaged in an amount to be determined at trial.

## AS AND FOR A SECOND CAUSE OF ACTION
**(Misappropriation of Trade Secrets Under New York Common Law)**
**(Against CW and REDS)**

52. Apex repeats and realleges each of the foregoing paragraphs as if set forth in full herein.

53. The Trade Secrets constitute trade secrets under New York law because, as set forth above, Apex has taken reasonable measures to keep the Trade Secrets secret, and the Trade Secrets were valuable to Apex because they were not generally known and, as a result the Trade Secrets had significant competitive value to Apex.

54. CW misappropriated the Trade Secrets in breach of the Terms, which bar users from, *inter alia*, (a) using the Platform, directly or indirectly, to create a derivative product; (b) using the Platform to "provide services that compete, directly or indirectly, with [Apex] or its affiliates;" (c) copying, distributing, or disclosing any part of the Platform's services or products; and (d) "[i]mpersonat[ing] another person or entity, misrepresent[ing] your affiliation with any person or entity, engag[ing] in fraudulent activity, or conceal[ing] or attempt[ing] to conceal your identity." (Ex. A, VII(b)(1), (8), (9), (14).)

55. On information and belief, CW disclosed the Trade Secrets to REDS without authorization from Apex.

56. On information and belief, REDS used and continues to use the Trade Secrets in connection with its updated version of the Marketplace, which incorporates many of the Trade Secrets. On further information and belief, REDS knew that the Trade Secrets were acquired by improper means as CW leadership oversees REDS and the Marketplace.

57. As a direct and proximate result of Defendants' misappropriation, disclosure and use of the Trade Secrets, Apex has been damaged in an amount to be determined at trial.

**AS AND FOR A THIRD CAUSE OF ACTION**
**(Breach of the Terms)**
**(Against CW)**

58. Apex repeats and realleges each of the foregoing paragraphs as if set forth in full herein.

59. When CW employees created the "Marv Harry" account on the Platform, CW accepted the Terms and entered into a binding agreement with Apex.

60. By the Terms, CW agreed that it would not (a) use the Platform, directly or indirectly, to create a derivative product; (b) use the Platform to "provide services that compete, directly or indirectly, with [Apex] or its affiliates;" (c) copy, distribute, or disclose any part of the Platform's services or products; or (d) "[i]mpersonate another person or entity, misrepresent your affiliation with any person or entity, engage in fraudulent activity, or conceal or attempt to conceal your identity." (Ex. A, VII(b)(1), (8), (9), (14).)

61. Apex performed its obligations under the terms.

62. CW, however, breached the Terms by, among other things, accessing the Platform using a false identity and using the Platform to create a competing product.

63. As a direct and proximate result of CW's breach of the Terms, Apex suffered damages in an amount to be determined at trial.

**AS AND FOR A FOURTH CAUSE OF ACTION**
**(Unjust Enrichment)**
**(Against REDS, in the Alternative)**

64. Apex repeats and realleges each of the foregoing paragraphs as if set forth in full herein.

65. To the extent the Court determines that the Terms are not a binding contract, REDS has been enriched through its access to and use of the Trade Secrets.

66. Particularly given that REDS acquired the Trade Secrets from CW, which misappropriated them using a false identity, equity and good conscience militate against permitting REDS to retain any benefit it received from its acquisition of the Trade Secrets.

**AS AND FOR A FIFTH CAUSE OF ACTION**
**(Unfair Competition)**
**(Against CW and REDS)**

67. Apex repeats and realleges each of the foregoing paragraphs as if set forth in full herein.

68. The Platform and the advanced features included in it were the result of the labor, skill and expenditures of Apex's employees and contractors.

69. CW's gained knowledge of these features by accessing the platform through the "Marv Harry" account in violation of the Terms.

70. REDS gained knowledge of these features through CW's unauthorized access and, on information and belief, was aware that knowledge was acquired by improper means as CW leadership oversees both REDS and the Marketplace.

71. CW's and REDS' conduct amounts to bad faith.

72. Apex suffered damages in an amount to be determined at trial as a direct and proximate result of CW's and REDS' conduct.

**PRAYER FOR RELIEF**

WHEREFORE, Apex respectfully requests that this Court enter judgment in favor of Apex and against Defendants as follows:

a. On the First Cause of Action, entering judgment in favor of Apex and against Defendants, and awarding Apex damages in an amount to be determined at trial;

b. On the First Cause of Action, entering judgment in favor of Apex and against Defendants, and issuing a permanent injunction enjoining Defendants from: (i) accessing or attempting to access the Platform; (ii) using, disclosing, or exploiting any information obtained any unauthorized access; and (iii) using the Trade Secrets in connection with the Marketplace or any other competing product or service;

c. On the First Cause of Action, finding Defendants willfully and maliciously misappropriated the Trade Secrets, and awarding Apex exemplary damages in accordance with 18 U.S.C. § 1836(b)(3)(C);

d. On the First Cause of Action, finding Defendants willfully and maliciously misappropriated the Trade Secrets, finding Apex is the prevailing party, and awarding Apex its reasonable attorney's fees pursuant to 18 U.S.C. § 1836(b)(3)(D);

e. On the Second Cause of Action, entering judgment in favor of Apex and against Defendants, and awarding Apex damages in an amount to be determined at trial;

f. On the Third Cause of Action, entering judgment in favor of Apex and against CW, and awarding Apex damages in an amount to be determined at trial;

g. On the Fourth Cause of Action, to the extent the Terms are not a binding contract, entering judgment in favor of Apex and against REDS, and awarding Apex damages in an amount to be determined at trial;

h. On the Fifth Cause of Action, entering judgment in favor of Apex and against CW and REDS in an amount to be determined at trial;

i. Awarding Plaintiff punitive and exemplary damages for Defendants' willful and malicious conduct;

j. Awarding Apex its attorney's fees and costs of this action;

k. Awarding Apex pre-judgment interest at the statutory rate; and

l. Such other and further relief as this Court deems just and proper.

**DEMAND FOR A JURY TRIAL**

Pursuant to Fed. R. Civ. P. 38(b), Apex hereby demands a trial by jury on all issues contained in this Amended Complaint that are triable by a jury.

TRACHTMAN & POLER LAW LLC

By: *Emily A. Poler*
Emily A. Poler

45 Main Street, Suite 810
Brooklyn, NY 11201
(212) 675-9060
emily@trachtmanpoler.com

*Attorneys for Plaintiff Apex Commercial Exchange, LLC*